**FRANCIS ANTHONY GALLELA**
2440 Tagalak Drive
Anchorage, Alaska 99054
(907) 333-6657
Fax (907) 333-0517
francis@francisgallela.com

Mr. Thomas V. Van Flein, Esq.
Clapp, Peterson, Van Flein, Tiemessen, Thorsness
1127 West Seventh Avenue
Anchorage, Alaska 99501

## PRELIMINARY ECONOMIC LOSS REPORT

Dear Mr. Van Flein:                                                                       19 April 2006

This report contains my preliminary findings of economic loss relative to the Airgas v. Eggleston case. I have also reviewed both the Affidavit and the report of damages from Strand and Associates and, for the reasons outlined later in this report, believe both of them to be in error.

My opinion and calculation of damages is reflected in Approach One on pages 4 and 5 of this report.

I have analyzed and discussed the Strand and Mohammadi opinions in Approaches Two and Three on pages 5 through 8 of this report.

### Background
Mr. Rick Eggleston sold his business, Interior Welding & Tool Supply, Inc. (IW&TS) located in Fairbanks, Alaska to AIRGAS NOR-PAC, INC. (Airgas) on or about 1 October 1999 via an Asset Purchase Agreement. At the time of sale, IW&TS sold welding supplies, gas and related

EXHIBIT ___1___
PAGE _1_ OF _8_

services as well as other industrial products. The terms of the sale included a Non-Competition and Confidentiality Agreement (non-compete) executed by both parties. Essentially, the non-compete agreement precluded Mr. Eggleston from selling welding supplies for a five year period. Mr. Eggleston stayed on with Airgas as an employee after the sale.

Mr. Eggleston's employment with Airgas terminated in August 2001. After termination in 2001, Mr. Eggleston then began a business called "Interior Tool & Expediting." This was a sole proprietorship that he operated out of his basement.

In 2002, Mr. Eggleston, along with others, formed Industrial Supply, LLC. Airgas asserted, in approximately April 2002, that Mr. Eggleston had violated the non-compete agreement by selling an extensive list of welding supplies to several customers.

This report examines that assertion as well as the written opinions of loss issued by Frederick Strand and Dee Mohammadi. This report also presents my opinion of loss.

The findings and discussion are presented in the following monographs.

## Measure of Damages

The measurement of damages as contained in paragraph 8 of the Non-Competition and Confidentially Agreement indicates that the calculation should be:

"…all profits or other benefits (collectively "Benefits) derived or received by Eggleston…"

This provision indicates that the measurement of loss to be used is net profits to Eggleston. Typically, the term "profits" is used to denote net profits. Therefore, any calculation of loss in this case that includes or relies on any other type of earnings or "profits" such as "gross profits", is an inaccurate representation of losses. I have extensively reviewed Mr. Egglston's financial records and found that the average percentage or ratio of net profits to gross sales that Eggleston recorded from 17 August 2001 through 30 September 2004 was calculated at .5 percent (net profit of $10,670 divided by the gross sales of $2,106,790). This net profit to sales ratio is representative of the profit percentage level earned by Eggleston over the period from start of new business to end of the non-compete agreement.

Therefore, in accordance with signed agreements between both parties, Eggleston's net profit percentage of .5 percent is used in all damage calculations in this report.

## Welding Equipment and Crossover Items

There appears to be no allegation (or facts) that Mr. Eggleston sold any gas or provided any services. The only issue at hand is the sale of welding equipment also referred to as hard goods. These items seem to be readily identifiable and include such items as tanks, gas, hoods, and so on. However, there are many industrial items that are "crossover" items. That is, some

EXHIBIT 1
PAGE 2 OF 8

construction equipment and supplies can be used by many trades for multiple uses and applications. An example of a crossover item would be a weed burner. The weed burner is commonly employed in a number of applications including weed control, sealing new tar in road repairs and a myriad of others. Incidentally, the weed burner can be used in some welding applications, but it is not strictly welding equipment. The same is true of tape measures, work gloves, chalk, and so on. Therefore, taking the total sales as done by Strand and Mohammadi is an error that improperly inflates the estimate of damages. In fact, the report from Strand assumes, incorrectly, that every item sold by Eggleston was a prohibited item. This is factually incorrect based on the terms of the agreement.

The losses as indicated by F.M. Strand & Associates both in the report and in the affidavit are found to be inaccurate and misleading due to the use of all types of equipment, whether welding or other, to calculate the damages. This error in methodology renders those findings unusable in this case. I correct this error in Approach One as detailed below.

N.B. For discussion purposes in this report, I will assume crossover items were included in the contract. However, it is equally, if not more plausible, to conclude that crossover items were not included in the contract.

## Calculation of Damages Approaches
The damages are presented using three approaches. These include:
1. My calculations using the actual sales of crossover/welding items as indicated in Eggleston company documents reviewed by experts in that field combined with the proper net profit percentage.
2. Recalculation of damages as contained in the affidavit by Dee Mohammadi dated 22 July 2005 using the correct net profit percentage and a critique of salient items in her affidavit.
3. Recalculation of damages using/assuming sales of equipment as contained in the report by Frederick Strand dated 6 March 2006 using the correct net profit percentage as well as a critique of the salient items in his report.

## Approach One
This approach contains my calculation and opinion of damages in this case.

The first step in the damage calculation is the identification of actual welding equipment sold by Eggleston. This was accomplished using other experienced individuals who are extremely familiar with welding and other industrial equipment. Mr. Mike Scott and Mr. Peter Barrios

EXHIBIT 1
PAGE 3 OF 8

reviewed the lists of sales for the period 4 August 2001 through 30 September 2004 and identified the items that may be construed as welding items although some may be crossover items. These items were summed and used in the calculations below.

The next step involved calculating the net profit percentage experienced by Eggleston during the same period. This is essential since the measure of damage is the profit experienced by Eggleston. Both the contract and Alaska law require this. Eggleston company statements reveal that for the period 17 August 2001 through 30 September 2004 the firm had $2,106,790.13 gross revenue and profit of $10,670.95 during that period. The resultant profit percentage is .5 percent.

Gross Sales of Welding/Crossover Equipment by Eggleston

| Time Period | Sales Amount |
|---|---|
| 4 August 2001 – 31 December 2002 | $ 8,712.46 |
| 2003 | 1,557.07 |
| 2004 (through 30 September) | 289.93 |
| Total | $10,559.46 |

Using the net profit percentage of .5 percent, the damages to Air Gas would then be **$52.79**.
    (.005 x $10,559.46)

**Approach Two**
The estimate of damages from Strand & Associates, P.C., as indicated in the affidavit produced by Dee Mohammadi dated 22 July 2005, is in error for several reasons including:

The customers cited in the estimate of losses as outlined in the attachment to Dee Mohammadi affidavit are not only consumers of welding equipment or supplies but are customers of other products also. Therefore, total sales to these customers can not be used in the assessment of losses.

Importantly, the items these customers purchased from Eggleston were not welding equipment or welding supplies. Therefore, the sales to these customers (of the various products) cannot be counted as damages in any calculations in this case.

In a lost profits case in the State of Alaska, the injured party is allowed only to claim as damages the net profit from the lost business revenues. This is in line with the reasoning that

EXHIBIT 1
PAGE 4 OF 8

the net profit is all the party would have benefited in any event.

However, Dee Mohammadi, in her affidavit and the attachment to her affidavit, uses gross sales of $1,501,941.32 rather than net profits to Eggleston to assess damages. This is the wrong methodology in Alaska court cases of this type and violates the agreement between the parties. The measurement of losses in this type of case is net profit losses. That is, the loss can only be the amount that the injured party would have received in the normal course of the business after all expenses were paid. The measurement that Mohammadi should have used is the net profit percentage experienced by Eggleston. Mohammadi's evaluation grossly inflates damages and equates sales with profits – a methodology not accepted under Alaska law and a violation of the signed contract.

Mohammadi's attachment AB lists the amounts supposedly sold as welding supplies to various customers. The attachment outlines the sales of equipment by customer and by year. I reviewed this affidavit and attachment. The sales figures listed apparently are gross sales totaling $1,501,941.32 for the years 2001 through September 2004. After 30 years of testifying on damages in Alaska courts, my understanding is that losses awarded in Alaska courts in these types of cases consist of only the net profit that would have gone to the "injured party" had it not been for the action of someone else. Therefore, Airgas can not claim the "gross sales" listed.

The calculation of sales of welding equipment indicated by Mohammadi amounted to $1,501,941.32 as indicated in the attachment to her affidavit.

Applying the correct net profit percentage of .5 percent to this level of sales would result in a damage estimate of only **$7,509.71.** (.005 x $1,501,941.32)

Accordingly, using her own assumptions of sales, Ms. Mohammadi overstated the potential damages by $1,494,431.61.

### Approach Three
This approach consists of a review of Frederick Strand's Report dated 6 March 2006, critique of the report and correction of the estimate of damages.

I reviewed the report issued by Frederick Strand dated 6 March 2006 and found multiple errors in methodology. These errors render his findings of loss as outlined in his report to be unsupportable and erroneous. The remainder of this section outlines the salient errors I have discovered as well as my estimate of damages using his schedule of sales but applying the correct net profit percentage.

Mr. Strand uses three methods to calculate damages. The following paragraphs address each of these methods.

EXHIBIT 1
PAGE 5 OF 8

First, Mr. Strand correctly states that the damages are the profits that Mr. Eggleston received on those sales that violated the agreement. He states this on page 2 of his report by quoting the proper section of the signed agreement between the parties which I have reproduced on page 2 of this report. However, Strand disregards this on page three of his report where he calculates the loss by multiplying his estimate of total gross sales of welding equipment amounting $2,105,635 (an extremely erroneous estimate of sales of welding equipment) by the Eggleston gross margin percentage rather than the net profit percentage. Strand committed two errors in his methodology. That is, he falsely and severely inflates the estimate of damages and then uses a gross margin percentage of 29.2 percent when Eggleston's actual net profit percentage for the period in question was .5 percent. Using the correct net profit percentage in the calculations – but assuming Mr. Strand's estimate of sales - results in damages of **$10,528.18.** (.005 x $2,105,635)

Second, on page 4 of his report, Mr. Strand provides another estimate of damages based on sales to "prohibited customers" and commits the same mistakes as previously mentioned in this critique. That is, Strand takes the total sales to these "prohibited customers" (which assume all the sales consisted of welding equipment) and multiplies the sales by the gross margin percentage instead of the net profit percentage. His erroneous conclusion is a loss of $438,566 (see his page 4). Using his assumptions and his level of sales of $1,501,940 but applying the proper net profit percentage of .5 percent results in a loss of **$7,509.70.** (.005 x $1,501.940)

Third, Strand mentions a forecast of sales that was made with the assistance of Eggleston while Eggleston was still working with Airgas that reflected an increase of 7 percent in 2002 over actual sales of 2001. In fact, Eggleston did not make any forecast of sales for this period involving an increase of 7 percent. Mr. Eggleston actually produced a forecast of 3 percent. Which was then pumped up to 7 percent by Mr. Mark Bradley of Airgas.

In any event, using this methodology of failure to achieve a forecast to make or support a damage claim is improper due to the volatility of any forecasts and the uncertainty of the future as well as the speculation involved in the forecast. Additionally, after he left Airgas, Eggleston had no influence or control of sales effort and effectiveness of sales effort at Airgas and could never be held accountable for the Airgas staff's failure to achieve anticipated goals. Even if that 7 percent projection were reasonable, the Airgas staff was responsible for the sales after Eggleston left the company. Further, his new company sold non-welding equipment and could not have been responsible for any missed quotas by Airgas.

Strand's analysis on pages 4 and 5 where he calculates damages on sales lost due to failure to achieve sales estimates has no basis in any signed documents or agreements or any basis in any reproducible facts and is simply not valid methodology.

Strand's analysis on pages 4 through 6, his alternative 3, uses data and methodology designed and selected to achieve the results wanted rather than let the data lead where they may. The latter approach is permissible while the former is not.

EXHIBIT _1_
PAGE _6_ OF _8_

On pages 5 and 6, Strand mixes methodology. Whereas in the preceding calculations he used an Eggleston gross margin percentage (an error in itself as pointed out previously), on these pages Strand uses the Airgas gross margin percentage to calculate damages. In this last case, Strand continues his error of using a gross margin percentage instead of a net profit percentage. Therefore, this approach too is incorrect.

On page 6 of his report, Strand continues this third approach by subtracting actual sales from projected sales as though the projected sales were somehow guaranteed to Airgas. His result is $1,707,200.00 in lost sales. His methodology then assumes that all sales were welding equipment. Then he compounds his error by continuing to use gross margin percentages to calculate the damages on the lost sales.

Notwithstanding these errors, by using Strand's estimate of "lost sales of welding equipment" but employing the correct net profit percentage the resultant damage amounts to: **$8,536.00**.        (.005 x $1,707,200.00)


Discussion of attachments to the Strand report.

Attachment 3 in the Strand report outlines the gross margins experienced by Eggleston. Again, these calculations are useless in estimating damages in this case because the damages must be limited to net profits.



Attachment 4 in the Strand report is essentially the same schedule as that attached to the Mohammadi affidavit dated 22 July 2005 with the addition of six new customers with total sales to those customers amounting to $10,994.35. This schedule of sales is gross sales of all items to the clients on the schedule. The schedule to be worthwhile should detail just those items sold which are "welding equipment". Therefore, this schedule is useless in determining damages in this case.

Attachment 5 is an outline of sales experienced by Airgas in Fairbanks. These data have no use in the damage calculations in this case in any event.


**Concluding Remark**
N.B. If crossover items are not part of the non-compete scope, then damages to Airgas are nominal at best and not even worth the time in small claims court.


**On-going Research**
Research is on-going. As additional data or information is discovered, this report may be supplemented as appropriate.

EXHIBIT 1
PAGE 7 OF 8

Sincerely,

Francis Anthony Gallela

EXHIBIT 1
PAGE 8 OF 8